**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS**

| | | |
|---|---|---|
| **IN RE:** | : | **Case No. 25-52291** |
| | : | |
| **CAPTURE COLLECTIVE, INC. et al.[1],** | : | **Chapter 11 (Subchapter V)** |
| | : | |
| Debtors and Debtors-In-Possession. | : | **Judge Tiffany Strelow Cobb** |
| | : | |

**REPORT OF SUBCHAPTER V TRUSTEE
IN SUPPORT OF CONFIRMATION OF DEBTORS' AMENDED
JOINT PLAN OF REORGANIZATION (Doc. No. 146)**

**NOW COMES** Donald W. Mallory, the duly appointed Subchapter V Trustee (the "Trustee") in the above captioned case, and hereby submits his Report in Support of Confirmation of the Amended Plan of Reorganization of Capture Collective, Inc. ("Capture"), Capture Diagnostics, LLC ("Diagnostics") and Capture Diagnostics HIB01, LLC ("HIB01") (Capture, Diagnostics and HIB01 each being a "Debtor" and collectively, the "Debtors") dated August 18, 2025 (the "Amended Plan") (Doc. No. 146).

**A.    Background Information**

1.    Each of the Debtors commenced these bankruptcies cases (the "Bankruptcy Cases") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code on May 27, 2025 (the "Petition Date").  The Debtors each made the election upon filing to have these Bankruptcy Case heard and considered under the chapter 11 subchapter V provisions added under the Small Business Restructuring Act of 2019.

2.    On May 29, 2025, pursuant to 11 U.S.C. § 1183(a), Trustee was appointed by the Office of the United States Trustee, Region 9 as Subchapter V Trustee (Doc. No. 17).

---

[1] The Debtors in these cases, along with the last 4 digits of each respective Debtor's federal EIN, are as follows: Capture Collective, Inc. (*7777); Capture Diagnostics, LLC (*9259); and Capture Diagnostics HIB01, LLC (*1325). Debtors' collective mailing address is 4923 Dierker Road, Columbus, OH 43220.

3.      Since the Petition the Debtors have continued to manage their affairs as debtors-in-possession and operate as going concern. The Debtors have continued to pay their post-petition obligations in the ordinary course of their business.

4.      The bar date for creditors and parties-in-interest to file claims was set for and lapsed on July 25, 2025 as to non-government entities and on November 23, 2025 for government entities. See *Order Setting Bar Date for Filing Proof of Claim or Interest* (Doc. No. 45).

5.      Pursuant to 11 U.S.C. § 1183(b)(3)(B), Trustee has standing to be heard at any hearing that concerns confirmation of a plan of reorganization.

**B.      The Debtor's Business And Events Leading To The Filing Of The Instant Bankruptcy Case**

(i) <u>The Debtors</u>

*Collective*

6.      Collective, out of the gate, is markedly usually from a typical chapter 11 debtor in that it is a "startup company". A startup company is a new business, often tech-focused, built for quick growth by specifically solving a new existing modern-day problem with an innovative approach, idea or product that can be brought to market.  The startup business model is unlike a typical business that aims for a stable sustainable growth over the long term. With a startup, the primary focus is to seek significant investment for high risk, and market impact (think IPO). Key characteristics of a typical startup company tend to include risk (as the problem/issue it seeks to solve is often new or novel), rapid innovation, sources of venture capital and often creating some new product or new market that does not exist. In Trustee's opinion, parties would be well served in keeping this fact in mind to assist in understanding how the nature of a startup business will not fit perfectly into the typical boxes one would have in mind in evaluating a plan of reorganization.

7.      Collective was founded in September 2019 as a Delaware corporation to commercialize a diagnostic device to assess and triage radiation sickness. Plan at 146-1 pg. 2/82. "Through an exclusive license of certain radiation-related technology, called biodosimetry, from

Ohio State University ("OSU"), Collective is developing a medical testing device that will help victims of a nuclear emergency, such as a war or accident, by rapidly determining the amount of radiation exposure so that immediate and appropriate medical countermeasures can be administered." *Id.* Such a device requires extensive research and governmental approval to be expanded to the masses and the product is still in a stage of research and development. Notwithstanding, the Debtors believe the product has significant commercial value to government and subsequently, in oncology and radiation treatment applications.   Collective runs a relatively lien operation through a small research lab based in Columbus, Ohio. *Id.* As for funding, Collective has been awarded a $2.2 Million research grant from the National Institute of Health ("NIH") to be paid over three years. In addition, OSU has named Collective as a major subcontractor for a recent grant submission. As has been discussed throughout the case, these grants are restrictive in nature but the funds can be used to such costs as overhead expenses and salaries.

*Diagnostics and H1B*

8.      In keeping in line with the focus of a startup in addressing a new market opportunity with new innovative products, Collective began working with SynergyMed Global Design Solutions ("Synergy") and the National Kidney Foundation of Hawaii ("NKFH") in Hawaii to provide COVID PCR testing during the COVID-19 pandemic. *Id.*   To ride this wave, Collective created separate subsidiaries Diagnostics and HIB, both Delaware LLC's, in early 2021 to expand the business. Diagnostics' primary role was buying and selling test kits wholesale and holding inventory while HIB owned and operated a store front clinical diagnostic lab based in Hawaii.

9.      During the height of the Covid-19 Omicron transmissions, Diagnostics purchased large quantities of test-related inventory in the expectation the crisis would continue well into 2022. *Id.* However, while good news for the public at large, due to expanded vaccination programs the health crisis was downgraded going into the second quarter of 2022 which dramatically reduced need for testing.  As a result, Diagnostics was unable to sell or otherwise use their inventory prior to its expiration, thereby creating large losses of testing material that was paid for but had now

expired. From September 2022 to May 2023, Collective attempted to transform Diagnostics into non-COVID testing operations, but to no avail. Diagnostics and HIB ceased operations at the end of May 2023 when the pandemic national emergency officially ended and the once thriving demand for rapid testing evaporated.

(ii) The Debtors Assets and Liabilities

10.     At the time of filing, the Debtors' assets can be summited in two categories: (a) tangible assets which consist principally of cash, a few accounts receivable, and lab equipment and (b) intangible assets which consist of intellectual property and litigation claims. The Debtors' liabilities at the time of filing includes income taxes owed to the State of Hawaii and disputed litigation claims, mainly for breach of contract. A complete list of assets and liabilities along with estimated values is set forth in each of the Debtors' Schedules filed in their respective cases. As was discovered post-filing, the Debtors will receive a post-petition Tax Refund from the State of Hawaii which will be utilized to partially fund the Plan.

(iii) Management and Employees

11.     Collective is owned by 49 shareholders consisting primarily of investors who participated in Collective's capital raises in 2019 and 2020. There is no single majority shareholder. Diagnostics is owned by Collective (94.44%) and Green Coral Trust (5.46%). HIB is wholly owned by Diagnostics. The Board of Directors for each entity is the same and consists of Collective co-founder Scott Barnes, David Moritz and Daniel Longhi all of whom have served since September 2022. Mr. Barnes has served as President since 2022 and Mario Morales currently serves as Vice-President of Operations. Collective currently has 5 full-time employees but also contracts with various consultants which serve a specific research related purpose.

(iv) Reasons for the Chapter 11 Fillings

12.     Debtors' Plan sets forth in detail the reasons for the Debtors' chapter 11 filings at Plan pgs. 5-8 which Trustee incorporates herein in by reference.  Notwithstanding, Trustee would summarize that nexus of the Debtors' financial woes originated from the divergence of its core

business to the Covid related testing in Hawaii and its business relations related thereto with Synergy, NKFH, Datahouse, Island Distribution Services, LLC and the State of Hawaii taxing authorities. These multiple and expensive events inhibited the Debtors' ability to obtain funding and to focus on their primary mission to develop their radiation testing device. The bankruptcy was filed to enable the Debtors to manage their debt, preserve their staff who have significant experience with the research, remove the cash bleed from litigation costs and emerge with a viable entity that can attract new financing in a return to their core mission.

**C.    The Purpose Of Subchapter V And The Role Of The Trustee In The Bankruptcy Case**

13.     "The Small Business Reorganization Act (SBRA), enacted in August 2019, became effective on February 19, 2020. It is commonly called Subchapter V because all of its provisions are contained in Subchapter V of Chapter 11 of the Bankruptcy Code. Subchapter V was designed to help small businesses reorganize by streamlining the cumbersome and often expensive process of a typical Chapter 11 reorganization case. The statutory hope is that by "encouraging small business reorganizations more creditors will receive greater distributions, debtors will pay less in attorneys' fees, and more small businesses will survive and prosper." *In re Ellingsworth Residential Cmty. Ass'n*, 2020 Bankr. LEXIS 2897, *1 (M.D. FL. 2020).

14.     The Subchapter V Trustee primarily serves as a *facilitator* between a debtor and its creditors to work towards the ultimate goal of a consensual Chapter 11 Plan of Reorganization.

15.     The statutory duties of a subchapter V trustee are limited as set forth in § 1183 of Title 11 of the United States Code 101 *et seq.* (the "Bankruptcy Code"), which incorporates by reference certain chapter 7 trustee duties as specified in § 704(a) and certain chapter 11 trustee duties as specified in § 1106(a).

**D.    Significant Events During The Bankruptcy Case**

16.     During the administration of the case, the Trustee reached out to the Debtors' creditors in an attempt to facilitate their involvement and input regarding the case and eventual

plan.  In particular, Trustee worked closely with counsel for Synergy and until their withdrawal, counsel for Green Coral Trust and Island Distribution Services.  Likewise, throughout the case, the Trustee has worked cooperatively with counsel for the Debtors and were possible, with the Office of the United States Trustee ("UST") to review all matters pertaining to the Debtors' business, work through issues of first day motions, stabilizing the business and this case and turning then to an ultimate resolution with Synergy.  The interested parties have mostly worked together cooperatively to interpret and apply the subchapter V provisions of the Bankruptcy Code and attempted at every opportunity, to avoid any unnecessary litigation and related costs to the estate.  Trustee is very appreciative of the Court's willingness to permit zoom hearing on multiple occasions which significantly decreased the overall administrative costs of professionals in this case.

17.    The Plan sets forth the significant motions and event that occurred during the course of the administration of these cases and Trustee incorporates same by reference. Amended Plan Pgs. 8-12.  Trustee does note there was an unusual situation relating to Debtors' filed Motion to Require Compliance with Bankruptcy Rule 2019 (Doc No. 109) requesting that counsel for Island Distribution Services, LLC and Green Coral Trust to file appropriate disclosures required by Bankruptcy Rule 2019. At the end of the day, forms of 9019 Statements were filed at Doc. No's 144 and 145.  Subsequently, thereafter, the filed proofs of claim of Island Distribution Services, LLC and Green Coral Trust were withdrawn at Doc. Nos. 144 and 145.

**E.    Evolution Of The Plan: The First Draft Not Filed The Court**

18.    At the onset of the case, the Debtors (through counsel) and Trustee, in hopes of avoiding unnecessary litigation and related costs to the estate, agreed to a working relationship whereby the plan process, and any objections thereto, would first be addressed informally in an attempt to lead to an agreeable plan of reorganization without the need for costly litigation. Likewise, Trustee worked with parties in interest to this case in hopes of amicably resolving

disputes. This process worked well leading to no formal objections to any of the proposed plans being filed until the unexpected objection filed by the UST on the eve of confirmation.

19.     Off the record, so to speak, Debtors remitted an initial draft plan to the Trustee for comment. Trustee worked with Debtors and participating creditors to revise the plan in a manner that that would address the concerns of Trustee and those of the participating creditors. For example, the original draft plan only provided for payment to unsecured creditors of $100,000, had no backstop on sales, did not address issue relating to substantive consolidation for plan purposes and several other items that required revision. Again, this was a first working draft.

20.     As the docket reflects by multiple stipulations, Debtors and Synergy were working with each other in relation to responses to discovery requests and 2004 examinations. Trustee was in communication with the parties during this period. In addition, Debtors filed their objection to the claims of Green Coral Trust (Doc. No. 79), Island Distribution Services, LLC (Doc. No. 80) and that of Synergy (Doc. No. 86).

**F.      Evolution Of The Plan: The First Plan Filed With The Court**

21.     On August 22, 2025, Debtors filed their plan of reorganization (the "Original Plan") (Doc. No. 89). Prior to the filing of the Original Plan, feedback regarding certain provisions was provided and the Debtors incorporated certain of the Trustee's suggestions, subject to the Trustee's reservation of rights, to further analyze and object to the Original Plan.

22.     Also prior to the filing of the Original Plan, Trustee had several separate conferences with both the Debtors and counsel for Synergy regarding its claim (the "Synergy Claim"). However, at the time of the filing of the Original Plan, the Synergy Claim dispute remained unresolved although a better understanding of each party's respective position and parameters for a possible settlement were obtained. Likewise, Debtors' counsel was continuing to work with counsel for Debtors and then counsel for Island Distribution Services, LLC and Green Coral Trust to resolve disputes with respect to those claims. As also reflected on the docket,

counsel for the Debtors' and Island Distribution Services, LLC and Green Coral Trust developed somewhat of a working relation as indicated by the stipulations entered into by and between the parties and the 2004 exam withdrawal. As such, the Original Plan, while developed in content, was more of a placeholder plan, yet same provided the revised outline of a structure to enhance negotiations.

23.    Thereafter, Trustee once again, in consultation with certain creditors, reiterated further comments to the Original Plan — in particular in relation to disclosures, classification and treatment, distributions, the treatment of secured claims, the desire for a backstop provision to address the uncertainties associated with a portion of the funding mechanism regarding the sale of the biodecimeter. Notwithstanding, at this point, the largest remaining impediment towards having a confirmable plan, a consensual plan, was the Synergy Claim dispute and that with Island Distribution Services, LLC and Green Coral Trust. One of the incentives/benefits of a Subchapter V case is the speed at which the case is to progress. Notwithstanding, in this case, as with others, it was clear to the Trustee that some additional time and space was needed for the parties to get into a settlement mindset posture. It is key to note that no party, including the UST, submitted any objections to the Original Plan nor discussed any issue with the contents thereof with Trustee or Debtors' counsel.

24.    Shortly thereafter, Debtors reached an agreement resolving the Synergy Claim and related disputes. Notwithstanding, at that time, with Island Distribution Services, LLC and Green Coral Trust dispute was ongoing and appeared to be unsolvable despite rerepeated settlement attempts. As such, to keep the case moving, Debtors revised the Original Plan again to incorporate the Synergy settlement and certain other issues as raised by Trustee including but not limited to a backstop from management in relation to sales of the radiological device.

25.    On October 24, 2025, the Debtors' Amended Plan (Doc. No. 146), which is the plan version sought to be confirmed by this Court, was filed which fully incorporates the Synergy

settlement.

26.    Of note thereafter, counsel for Green Coral Trust and Island Distribution Services filed motions to withdraw as counsel (Doc. Nos. 142 and 143).  On October 27, 2025, Green Coral Trust and Island Distribution Services each withdrew their respective proofs of claim filed in these cases (Doc. Nos. 147 and 148) and thereby exited these cases.

**G.    The Amended Plan, Plan Objection and Balloting**

27.    As a result of the above, currently before this Court, the Debtors seek confirmation of the Amended Plan on a ***consensual basis*** under Bankruptcy Code section 1191(a). Primarily, the Amended Plan corrects some technical and clerical items, but ultimately was filed to incorporate the Synergy Settlement, provide for a backstop from management to buttress the portion of the plan that would be funded by the sale of the radiological device and certain other changes to comport to the Global Settlement. The full breadth of the work and evolution of the plan itself from the Original Plan to the Amended Plan are set forth in the redline comparison copy filed by Debtors at Doc. No. 146-2, pgs. 1-44.

28.    Pursuant to the *Order (A) Setting Hearing on Confirmation of the Debtors' Plan of Reorganization and (B) Establishing Certain Related Deadlines* (Doc. No. 149), the deadline for interested parties to file an objection to the Amended Plan was December 5, 2025 (the "Plan Objection Deadline").  The only objection filed in opposition to the Amended Plan filed by the Plan Objection Deadline was that of the UST which was filed on the Plan Objection Deadline ("UST Objection") at Doc. No. 164.   Trustee and Debtors were not made aware of any of the UST concerns with the Amended Plan until November 28, 2025. During a call with UST on December, 2025, Trustee was advised that at that point, UST was resolved to file its objection.

29.    On December 9, 2025, the Debtors filed their *Certification of Acceptances and Rejections of Ballots* (Doc. No. 167). The Certification indicated that the required voting classes had accepted the Amended Plan. *Id.*  Accordingly, confirmation is to proceed on a consensual

basis under §1191(a) of the Bankruptcy Code as the Amended Plan was accepted by its creditors entitled to vote and satisfies both the numerosity and amount requirements of 1126(c).

**H.      Trustee's Recommendation**

30.      The Trustee has analyzed the Amended Plan considering both the technical requirements for confirmation and the goals and objectives of the subchapter V provisions as well as the results of balloting. The Trustee submits this report to assist the Court in its evaluation of the Amended Plan and in support of confirmation.

**I.      Analysis – Confirmation on a Consensual Basis**

31.      The Debtors have "the burden of proving by a preponderance of the evidence that the applicable provisions of the Bankruptcy Code have been met. *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 459-460 (Bankr. S.D. Ohio 2011). The Court has an independent duty to determine compliance with each of the Bankruptcy Code's confirmation requirements. *Id.* at 458-459. Importantly, this is true even for those confirmation requirements that are not the subject of an objection. *Id.*" cited by *In re Lapeer Aviation, Inc.*, 2022 Bankr. LEXIS 2905, *5 (Bankr. E.D. Mich. October 11, 2022).

32.      Further, under Subchapter V, confirmation of a plan is governed by a combination of certain subsections of section 1129 and section 1191. Section 1191(a) provides that the following subsections of section 1129 do not apply in a subchapter V case: 1129(a)(15) (means test in individual chapter 11 cases); 1129(b) (cram down provisions); 1129(c) (court may confirm only one plan); and 1129(e) (requirement that plan in small business case be confirmed within 45 days). Subchapter V does require that the plan classify claims and that it be submitted to creditors for balloting. 11 U.S.C. §§ 1122 and 1191(a). Confirmation of a plan under section 1191 is either consensual or, if one or more impaired classes votes to reject the plan, non-consensual. Note that priority claims under sections 507(a)(2) (administrative expenses) and 507(a)(3) (unsecured "gap period" claims in involuntary cases) may be paid over the life of the plan notwithstanding

section 1129(a)(9)(A). 11 U.S.C. § 1191(e). A plan providing for such delayed payment of these priority claims must be confirmed non-consensually under 11 U.S.C. § 1191(b).

33.     As to a <u>consensual plan</u>, section 1191(a) provides that the court may confirm a plan only if all requirements of section 1129(a) other than 1129(a)(15) are met. This is "consensual" confirmation. Effectively, this requires that all impaired classes accept the plan. In a consensual plan, the debtor generally makes payments under the plan directly. Except as otherwise provided in the plan or confirmation order, the confirmation of a consensual plan discharges the debtor under section 1141(d), and section 1141(d)(5) does not apply in subchapter V cases to delay the discharge for individual debtors. 11 U.S.C. § 1181(a). The trustee's services are terminated upon the substantial consummation of a consensual plan. 11 U.S.C. § 1183(c)(1).

**J.     Application To The Instant Case -  Trustee Recommendation For Confirmation**

34.     As the Court is aware, the aspiration and goal of any Subchapter V case is to reach a Consensual Plan of Reorganization.  In the instant case, this goal of a consensual plan was also of paramount importance to the Debtors in that the failure to obtain a consensual plan, and thereby keeping the Debtors in bankruptcy for five years without a discharge, would significantly and detrimentally impede on the Debtors' ability to obtain new investor funding to ensure the development of the device and the future success of the business.

35.     Trustee is pleased to report that the Amended Plan is a consensual plan – meeting the goals of subchapter V - and a plan that pays Class 2 unsecured creditors a pro-rata portion of a creditor pool of $300,500.00.  See Doc. No. 146-1, Amended Plan, Article III., Section 2 (b), pg. 15/82. As the Amended Plan is consensual, under Section 1191(a) of the Bankruptcy Code: $100,000 of the Creditor Pool will be paid to holders of Allowed Claims on the Effective Date or shortly thereafter as is reasonably practical. *Id.* Another $100,000 distribution will be made to holders of Allowed Claims within 30 days after receipt of the Tax Refund, expected in early 2026. *Id.* The remaining $100,500 will be made in yearly installments as follows: $15,000 on December

31, 2026; $15,000 on December 31, 2027; $12,000 on December 31, 2028; $22,500 on December 31, 2029; and $36,000 on September 30, 2030 (the "Remainder Payment"). *Id*. The Amended Plan does provide for future sales of the biodosimeter to certain markets in its projections. *Id*. However, the biodosimeter sales are useful but not required to fund the Amended Plan distributions.

36.     Thus, notwithstanding that the Amended Plan pays out under same for a period of five years, within a ***very short period after confirmation***, **Class 2 unsecured creditors will then have been paid 2/3 of the dedicated distribution.**  Further and most importantly, the **Amended Plan provides a backstop to ensure payment of the Remainder Payment and the Tax Payment notwithstanding the results of the sales of the biodosimeter**.  See Doc. No. 146-1, Amended Plan, Article VII., (g), pg. 28/82. **In the event, sales proceeds are insufficient for Debtors to make a Remainder Payment or a Tax Payment, compensation for management will be furloughed so that the required payment can be made**. *Id*.  The use of restricted grants can be utilized for salaries of management.  Thus, by the use of the backstop provision, in the event of a shortfall, management is personally directing the funds to the Reminder Payment and Tax Payment.  Trustee negotiated and required this provision to be added to plan specifically address and buttress the plan in light of the limited history with the sale of the biodosimeter.

**K.     Response To UST Objection**

37.     The Trustee greatly respects and appreciates the role of the UST.  Trustee typically finds himself aligned the with the positions taken by the UST in these cases.  However, in this instance, having an independent duty, Trustee finds himself of a different mindset than that of the UST.  Trustee also notes that during a portion of the plan process, the UST was unavailable due to a government shutdown which did leave gaps in the communication between the parties. Notwithstanding, the UST Objection is premised on four primary pillars: (i) The Amended Plan was not proposed in good faith, (ii) the Amended Plan's financial projections are speculative, (iii)

the exculpation provision are overly broad and (iv) substantive consolidation in an extreme remedy that cannot be achieved through Debtors' Plan.  The reasoning of why each of the above objections are without merit to halt confirmation will be addressed in turn.

**(i) The Amended Plan was proposed in good faith.**

38.    Pursuant to § 1129(a)(3), a plan must have "been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Although the Bankruptcy Code does not define the term 'good faith,' the Sixth Circuit has held that '§ 1129(a)(3) expressly requires an inquiry into the debtor's motives in proposing the plan . . . .'" *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 518 (Bankr. S.D. Ohio 2021) (Judge Hoffman) citing *Village Green I, GP v. Fed. Nat'l Mortg. Ass'n (In re Village Green I, GP)*, 811 F.3d 816, 819 (6th Cir. 2016). "[T]he important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 518  citing *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *see also Trenton Ridge*, 461 B.R. at 468.

39.    In the case of *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, Judge Hoffman further expanded on "good faith" by adopting a totality of circumstances approach:

> One of the primary purposes of Chapter 11 is the **preservation of the business as a going concern**. *See Trenton Ridge*, 461 B.R. at 469. Another is the "**maximization of the value of the estate**." *Id.* (quoting *In re Bonner Mall Partnership*, 2 F.3d 899, 916 (9th Cir. 1993)). In assessing whether the Debtors proposed the Plan in order to achieve a result consistent with the purposes of the Bankruptcy Code, the Court must examine **the totality of the circumstances**. *See Trenton Ridge*, 461 B.R. at 468-69.

*In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 518 (Bankr. S.D. Ohio 2021) (emphasis added).

40.    As noted at the inception of this report, Debtor Collective is a startup company. Thus, UST attempts to fit a square peg in a round hole by applying a traditional financial analysis of an established business operation to a startup entity. This flaw is clearly indicated by the UST where it is argues that the "Debtors do not have a regular stream of income. . . making derived

sales. . . speculative." UST Objection at pg. 4.  In doing so, UST failed to recognize that Collective, by its very nature, has not had an ordinary stream of revenue.  The near entire argument of lack of good faith by UST is premised on the failure to consider the difference between a startup company and an established business.  This is a fatal error leads to the conclusion that the UST analysis on this point is flawed.

41.    Debtors' sale prospects from its device and collections of it's A/R appear reasonable in light of their experience with the A/R in question and the expertise and business acumen of their management.   Notwithstanding, **Debtors have not based payments to creditors solely on sales and A/R revenues**. Rather, the Debtors propose to pay Class 2 unsecured creditors the Creditor Pool ($300,500) from assured sources. One third of the Creditor Pool ($100,000) will be paid from cash currently sitting in the Debtors' debtor-in-possession account on the Effective Date – this is not speculative. The second third ($100,000) will be paid as soon as the Tax Refund is received in early 2026 - this is not speculative. The final third ($100,500 – the Remainder Payment) will be paid in yearly installments that are fully backstopped. As noted above, Trustee negotiated and required a backstop as to the Remainder Payment $105,000 payment and the Tax Payment.  The Amended Plan **provides such a backstop to ensure payment of the Remainder Payment and the Tax Payment notwithstanding the results of the sales of the biodosimeter**.  See Doc. No. 146-1, Amended Plan, Article VII., (g), pg. 28/82. **In the event, sales proceeds are insufficient for Debtors to make a Remainder Payment or a Tax Payment, compensation for management will be furloughed so that the required payment can be made**. *Id.*  The use of restricted grants can be utilized for salaries of management.  Thus, by the use of the backstop provision, in the event of a shortfall, management is personally directing the funds to the Reminder Payment and Tax Payment. Thus, the actual amounts generated by sales or collected from receivables is not of paramount relevance to plan funding. Hence, further reducing the alleged speculative nature that concerns the UST in this case.

42.     UST further makes arguments regarding the lack of good faith in posturing that Debtors failed to substantiate that they are committing all projected disposable income to the plan for 5 years. UST Objection at pg. 4.  This argument is easily dispensed with in that the Amended Plan is a *consensual* plan being sought to confirmed under § 1191(a).  The issue of proving committed of all "projected disposable income" is only relevant if the subject pan sought to be confirmed is *nonconsensual* under § 1191(b).  Thus, this argument must be rejected whole cloth.

43.     Considering the totality of the circumstances in this case, Trustee respectfully submits that it is clear that Debtors proposed the Amended Plan in order to achieve a result consistent with the purposes of the Bankruptcy Code; namely, preserving the business as a going concern while maximizing the value to the estate.   Therefore, it appears that the Debtors have proposed the Amended Plan in good faith.   See *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 518 (Bankr. S.D. Ohio 2021).

**(ii) The Plan Is Feasible; Fair And Equitable Analysis Irrelevant.**

44.     UST continues its objection as to the Debtors' projections noting "unfounded optimism."  UST Objection at pg. 5. However, this line of objection again suffers from the same ill fate and earlier discussed, the UST's failure to take into consideration that the Collective is a startup company and not a company with a prolonged history of sales to which the UST is accustomed.  However, as demonstrated above, the actual amounts generated by sales or collected from receivables is not of paramount relevance to actual plan funding (2/3 of which will be funded within the first part of 2026 with the first $100,000 from funds currently in its DIP Account on the Effective Date).

45.     The UST Objection further objects to confirmation on the grounds that the Amended Plan is not "feasible" nor "fair and equitable."  UST Objection pgs. 5-6.  The latter prong, that the Amended Plan is not "fair and equitable" is easily dispensed with and will be addressed first.   A "fair and equitable" analysis would only be relevant in this case if Debtors were seeking to confirm the Amended Plan under on a nonconsensual basis (cramdown) under § 1191(b):

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of section 1129(a) of this title, other than paragraphs (8), (10), and (15) of that section, are met with respect to a plan, the court, on request of the debtor, shall confirm the plan notwithstanding the requirements of such paragraphs if the plan does not discriminate unfairly, **and is fair and equitable**, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. §1191(b) (emphasis added).

46.    As the Amended Plan is sought to be confirmed on a consensual basis under § 1191(a) (non-cramdown), the fair and equitable analysis is irrelevant.

47.    Next, the UST asserts that the Amended Plan does not satisfy § 1129(a)(11) of the Bankruptcy Code that requires a finding that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization", the so-called "feasibility test," again asserting that Debtors' sales projections and the collectability of accounts receivable are unrealistic and hypothetical. UST Objection, p. 5.

48.    Under § 1129(a)(11), the Court may confirm a Chapter 11 plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 518 citing 11 U.S.C. § 1129(a)(11). The requirement imposed by § 1129(a)(11) is known as the "feasibility" test for confirmation. *Trenton Ridge*, 461 B.R. at 478.

49.    With its argument as to feasibility, the UST once again marches to an ill-fated drumbeat failing to recognize the manner as to how creditors will be paid under the Amended Plan. In fact, if the UST position in this case was correct (which it is not) and was applied draconianly across the board to any startup company, there could never be a reorganization as the entity would not be able to prove "projections based on concrete evidence that is not speculative or conjectural." Trustee notes that the UST cites a 1992 10th Circuit case and a 2011 bankruptcy court case from the Dist. of Illinois to support its position; neither of which involves a

startup company and neither of which is binding on this Court (*In re Amed,* 973 F.D. 849 (10th Cir. 1992) and *In re Multiut Corp.,* Bankr. N.D. Ill. 2011).

50.     Further, the case law support cited by the UST appears to be in direct contradiction to the precedents in this district which clearly establish that feasibility is premised on a "reasonable probability." The purpose of the feasibility test is to determine whether there is a **reasonable probability** that creditors will receive the payments provided for in the plan; not a guarantee. *In re Trenton Ridge Invs.*, LLC, 461 B.R. 440 (Bankr. S.D. Ohio 2011)(emphasis added), citing *In re G-1 Holdings*, 420 B.R. 216, 267 (D.N.J. 2009) ("[T]he key element of feasibility is whether there is a **reasonable probability** [that] the provisions of the Plan can be performed.")(emphasis added); and *In re Brice Road Devs.*, LLC, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008) ("Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the **reasonable probability** of payment." (internal quotation marks omitted) (emphasis added)).  In fact, the Bankruptcy Code does not require that success is inevitable only that it is **reasonable**. *In re Trenton Ridge Invs., LLC*, 461 B.R. 440 ("When evaluating feasibility, the Court need not find that a proposed plan "'guarantee[s] success, but it must present **reasonable assurance of success**.'" A plan proponent establishes a reasonable assurance of success if the plan provides "'a realistic and workable framework for reorganization.'" (emphasis added) (citations omitted).

51.     Here Trustee avers, for the reasons stated herein, that the proposed Amended Plan provides a realistic and workable framework for the Debtors' reorganization. Trustee believes that testimony from the Debtors at the confirmation hearing will further shed light and add support to the reasonableness of the projections. Both Debtors and their creditors who have consented to the Amended Plan deserve a chance for the Debtors to succeed. The alternative is a conversion that will result in only a partial payment to the State of Hawaii and the IRS, zero money to unsecured creditors and the loss of a device that could very well assist in saving lives in the future; that cannot be the purpose of section 1129(a)(11).

### (iii) Exculpation

52.     Generally speaking, an exculpation clause is included in plans in accordance with

§ 1123(b)(6) of the Bankruptcy Code, which provides that Chapter 11 plans may "include any . .

. appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."

11 U.S.C. § 1123(b)(6). *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 501 (Bankr.

S.D. Ohio 2021).

53.     Here, the UST argues that the "exculpation clause is overbroad because it (a) is

not limited to estate fiduciaries; (b) fails to include the necessary temporal scope; and (c) included

language that turns the Exculpation into a non-consensual third-party release."  UST Objection at

pg. 6.  In the case of *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 501 (Bankr.

S.D. Ohio 2021) before this very Court, the UST argued almost identically that, that the

exculpation clause as issue therein was overly broad in two respects. "First, the UST claims that

the Exculpation Clause is improper 'because it extends beyond fiduciaries of the Debtors'

bankruptcy estates.' UST Obj. at 3. Second, the UST takes issue with the temporal scope of the

Exculpation Clause, contending that it may not extend to acts and omissions occurring

prepetition. *Id.* at 5 ('Plans should generally only exculpate those actions taken in connection with

a bankruptcy case between the petition date and the effective date of the plan.')."  *Id.* at 500.  After

a very detailed analysis, Judge Hoffman overruled the UST objection holding that "The Court

disagrees on both counts and accordingly overrules the UST Objection."  *Id.* at 500.

54.     Here, as noted, the UST posits that the exculpation provision in the Amended Plan

(Article VIIF, page 33) is overbroad and tantamount to an impermissible third-party release.  UST

Objection at pg. 6. Trustee finds this position surprising in that it mirrors the language this very

Court approved and to which the UST did not object, in *In re FRG Enterprises* ("FRG"), Case No.

23-54240, Plan at Doc No. 112, Article XIV, page 20 confirmed by Order at Doc No. 124 March

19, 2025.  In fact, it was Trustee who suggest to Debtors counsel that they review this provision

for the explicit purpose of seeing an exculpation provision that was deemed acceptable to the

UST in order to head off any issues relating to same.

55.     The Amended Plan provides as to exculpation that: On the Effective Date, the Debtors and all holders of Claims and Interests shall be conclusively deemed to release any Exculpated Party from any and all liabilities, claims, cost, damages and expenses arising out of the Cases, *except for claims arising from fraud, willful misconduct or gross negligence*. Amended Plan, Article VIIF, page 33) (emphasis added). Further, in the Definitions, Plan Exhibit A, page 50: 41. Exculpated Party means (a) all professional retained by order of the Bankruptcy Court in the Case including all of such professional's respective officers, directors, employees, principals, partners and agents and (b) all officers, directors, managers of the Debtors holding such offices at any time through the Effective Date of the Plan.

56.     A "third-party releases provide for the relinquishment of claims held by the debtor or third parties against certain nondebtor parties; by contrast, exculpatory clauses establish the standard of care that will trigger liability in future litigation by a non-releasing party against an exculpated party for acts arising out of a debtor's restructuring." *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 501. Here, there are is no relinquishment of claims held by the debtor or third parties against certain nondebtor parties.

57.     Trustee notes that in their response to the UST Objection, Debtors indicated that: "If there is confusion as the temporal scope, the Debtors can include a modification in the Confirmation Order that reads with current language and adds . . . arising out of the Cases through the Effective Date . . . .   Thus, premised on the fact that this Court has already overruled an objection to an exculpation clause on the grounds reasserted here by the UST in *Murray,* that the exculpation language in the Amended Plan mirrors that of a recent case of *In re FRG* that was approved by this Court without objection by the UST and Debtors offer for clarification, the UST objections to the Exculpation Clause should be overruled once again.

**(iv) Substantive Consolidation - The Plan Proposes Consolidation Solely For The Purpose Of Voting, Confirmation, And Distribution And Expressly Does Not Affect The Separate Legal Status Of The Debtors.**

58.     The UST argues that the Amended Plan proposes substantive consolidation, an extreme remedy that is not in the best interests of creditors. UST Objection at Pg. 8. The UST has failed to distinguish a typical full substantive consolidation with the limited purpose of same in the instant Amended Plan. The Amended Plan proposes consolidation solely for the *limited purpose* of voting, confirmation, and distribution and expressly does not affect the separate legal status of the Debtors. In particular, the Amended Plan provision provides that:

> The entry of the Confirmation Order shall constitute the approval as of the Effective Date, of the substantive consolidation of the Debtors **for all purposes related to the Plan, including for purposes of voting, confirmation and distribution, but the Debtors shall not be substantively consolidated for other purposes**. Pursuant to such order, (i) any claim against any Debtor and any guarantee thereof by any other Debtor and any joint or several liability of any of the Debtors shall be deemed one obligation of the consolidated Debtors, (ii) each and every Claim filed or to be filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors, and (iii) all duplicative claims(identical in both amount and subject matter) filed against more than one of the Debtors shall be automatically expunged so that only one Claim survives against the consolidated Debtors but in no way shall such Claim be deemed Allowed by reason of this Section. **Such substantive consolidation treatment shall not affect (i) the separate legal status and corporate structures of the Reorganized Debtors to effect restructurings as provided in this Plan, (ii) Subsidiary Equity Interests, (iii) Intercompany Claims, and, (iv) any defenses to any Causes of Action or requirements for any third party to establish mutuality in order to assert a right of setoff**. Diagnostics and HIB will not engage in further operations. Collective may, in its sole discretion, dissolve these two subsidiaries. (emphasis added)

59.     Nearly identical language was approved in a confirmed plan by in this District in the case of *In re Huffy*, Case no. 04-39148, Southern District of Ohio, (Plan at Doc No. 921, para. 7.1; Confirmation Order at Doc No.1239 (Judge Walter) for the same purposes.

60.     Without this procedural consolidation for distribution purposes, the Debtors would be forced to determine which creditors are Debtor specific, and it is likely that certain creditors would receive no recovery. Given the fact that there are only seven unsecured creditors (other

than Synergy) totaling about $40,000, the *limited* consolidation proposed is appropriate under the circumstances. Again, creditors of the Debtors have consented to this treatment.

### (v) Minor Issues

61.    The UST has identified certain issues as ones that can be "easily remedied." Rather than belabor the point, Trustee incorporates Debtors' response and proposed solutions to these issues.  See Debtors' Response at Doc. No. 172, pgs. 9-11. None of the issue in this section raised by the UST are significant to thwart confirmation. Notwithstanding, Trustee does note that with respect to Litigation Claims, Debtors, in their liquidation analysis set forth in Article VIIB2, a value of "unknown" for the Causes of Action and described the amount of the claims and the hurdles presented if a chapter 7 trustee chooses to pursue them.  Debtors cannot predict a value and do not want to prejudice any potential future case by picking a number or promising unsecured creditors a recovery that may not materialize.  However, should any funds from litigation claims actually materialize, under the Amended Plan, Class 2 Unsecured Creditors would receive ***in addition to the Creditor Pool***, a pro-rata share of the proceeds, if any, recovered from litigation of the Causes of Action more fully described in Article VII C.  Amended Plan, Doc. No. 146-1, Article III, section 2(b), pg. 15.  This is not an issue that should prevent confirmation, particularly when no part of the distribution to creditors or the operations of the Companies depends on any recovery from any Cause of Action but should any funds materialize, same would flow pro-rata to Class 2 unsecured creditors in addition to the Creditor Pool.

### L.    Conclusion

62.    Trustee will end as he began, noting that these cases are markedly usually from typical chapter 11 debtors in that Collective was and remains a "startup company."  As a startup, there is no historical financial data that one would typically find in a case where products are manufactured or services have been rendered. A startup, by its very nature, has not had an ordinary stream of revenue from which to evaluate on typical standards. Thus, from the outset, Trustee was aware that an analysis and approach of a startup business would not fit perfectly into

the typical boxes one would have in mind in forming a plan of reorganization.  Such a plan would require flexibility, creativity and give and take from management and creditors.

63.     Accordingly, there are two doors that can be taken in this case: Door One: the confirmation of a *consensual* Amended Plan with payment of Administrative Claims, Priority Claims and a minimum payment to Class 2 Unsecured Creditors of $300,500.00 and Door Two: where the UST Objection prevails, a conversion to Chapter 7 that will result in only a partial payment to the State of Hawaii and the IRS, zero money to unsecured creditors and the loss of a device that could very well assist in saving lives in the future.

64.     Trustee believes that the Amended Plan does meets all the requirements for confirmation and, therefore, should be confirmed. As noted earlier, "the statutory hope of Subchapter V is that by encouraging small business reorganizations more creditors will receive greater distributions, debtors will pay less in attorneys' fees, and more small businesses will survive and prosper."  *In re Ellingsworth Residential Cmty. Ass'n*, 2020 Bankr. LEXIS 2897, *1 (M.D. FL. 2020).  Clearly, this benchmark would be achieved here by confirmation of a consensual Amended Plan.  The Trustee looks forward to the Amended Plan being confirmed on a consensual basis with the UST Objection being overruled or withdrawn.

/s/ Donald W. Mallory
Donald W. Mallory (0070875)
600 Vine Street, Suite 2500
Cincinnati, Ohio 45202
Phone: (513) 852-6094
Fax: (513) 419-6494
E-Mail: dwmallory@woodlamping.com
Subchapter V Trustee

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Report of Subchapter V Trustee in Support of Confirmation of Debtors' Amended Joint Plan of Reorganization was served (i) electronically on the date of filing though the court's ECF System on all ECF participants registered in this case at the email address registered with the court and by (ii) ordinary First-Class U.S. Mail on December 10, 2025, addressed to:

None.

Donald W. Mallory
Donald W. Mallory (007875)

4702010.1